STATE *ex rel.* DUNLOP, *State Treasurer,* v. CRUCE *et al., Com'rs of the Land Office.*

No. 3191.  Opinion Filed March 12, 1912.

(122 Pac. 237.)

1. **MANDAMUS—When Lies—Commissioners of Land Office.** A mandamus will not issue to compel the performance of an act by the Governor of the state, but a mandamus to the Secretary of State, State Auditor, and two other state officers, who, with the Governor, comprise the Commissioners of the Land Office of the state of Oklahoma, may be issued to require them to perform ministerial duties cast upon them by law as members of said board.

2. **SCHOOLS AND SCHOOL DISTRICTS—State Treasurer—Control of Permanent School Fund.** There is no constitutional mandate or legislative act which directs that the permanent school fund donated by Congress to the state, or arising from the sale of public lands or other sources, shall be immediately placed in the hands of the State Treasurer.

(Syllabus by the Court.)

Application by the State, on the relation of Robert Dunlop, State Treasurer, for writ of mandamus against Lee Cruce and others, Commissioners of the Land Office. Writ denied.

*Charles West,* Atty. Gen., and *Charles L. Moore,* Asst. Atty. Gen., for relator.

*James H. Chambers,* for respondents.

KANE, J.   The questions herein involved grow out of an application for a writ of mandamus, filed in this court by the relator, wherein it is prayed that the respondents, as the Commissioners of the Land Office, be required to pay into the state treasury all sums of money in excess of $500 which are now or may hereafter come into their hands, possession, or control, as Commissioners of the Land Office, as income of the permanent school fund of said state together with all other moneys and revenues which form any part of the current public funds of the state, or other funds under the management and control of said state.

The petition alleges, in substance, that large sums of money derived from the rents of school lands and from donations of money, in lieu of school lands, are constantly coming into the hands of said respondents, constituting current public funds and revenues of the state of Oklahoma, and of funds under its control and management, the exact or even approximate amount of which is to the relator unknown, but which are greatly in excess of $500, which should be by said respondents immediately covered into the state treasury, there to remain until withdrawn or disbursed in accordance with law; that the said funds are in the possession, control, and custody of the defendants, through the secretary to the Commissioners of the Land Office, whose possession is the possession of said board, and who holds the same subject to the action, direction, and control of said board; that written demand has been made by said relator on said respondents to cover into the state treasury said moneys; that said defendants have failed, neglected, and refused, and still willfully and unlawfully fail, neglect, and refuse, to comply with said demand, or any part thereof, and will continue in their said failure, neglect, and refusal until compelled by the mandate of this court to perform their official duties.

The return of the respondents to the alternative writ raises the following questions:   (1) Has this court jurisdiction to compel, by mandamus, the Commissioners of the Land Office to perform a ministerial duty, in view of the fact that the Governor of the state is *ex officio* a member of the board?   (2) Is the relator, as State Treasurer, under the Constitution and laws of this state,

State ex rel. Dunlop, State Treas., v. Cruce et al., Com'rs of Land Office.

the legal custodian of those funds under its management and control, including the income from the permanent school fund, to the extent that he can compel the respondents to cover such funds coming into their possession or control, as Commissioners of the Land Office, into the state treasury?

That this court is without jurisdiction to control the action of the Governor by mandamus, even in ministerial acts, is settled by *City of Oklahoma v. Haskell,* 27 Okla. 495, 112 Pac. 992, and *State ex rel. Atty. Gen. v. Huston, Judge,* 27 Okla. 606, 113 Pac. 190, 34 L. R. A. (N. S.) 380. And there are authorities of eminent respectability which hold that the courts are without jurisdiction to compel the Governor to perform any official act whatsoever, either of an executive, political, or ministerial character, whether acting as Governor or as a member or trustee of public boards. The leading case of this class is *Sutherland v. Governor,* 29 Mich. 320, 18 Am. Rep. 89. *People ex rel. Broderick v. Morton,* 156 N. Y. 136, 50 N. E. 791, 41 L. R. A. 231, 66 Am. St. Rep. 547, is often cited to the same effect. In the latter case, however, it was held that, whilst mandamus will not issue to the Governor to compel performance of any act by him, "we see no reason for its not running to the Lieutenant Governor and Speaker of the Assembly," who, with the Governor, composed the board whose duty it was to perform the act sought to be enforced. There was no difference of opinion on the proposition just stated, although the court was very much divided on the main question. In the opinion of the court, written by Haight, J., Gray, Bartlett, and Martin, JJ., concurred; Van, J., concurred in the conclusion that the courts are without power "to command the Governor to do this or refrain from doing that; but it is still their duty to announce the law, and leave the responsibility of complying therewith with the chief magistrate." O'Brien, J., dissented, and Parker, C. J., agreed with Haight, J., that mandamus should not issue against the Governor, but was of the opinion that it was properly issued against the other defendants.

We are committed to the same rule as New York in relation to controlling the actions of the Governor, and, like the New York Court of Appeals, we know of no reason why the same rule

should be extended to the other defendants. The Governor has only one vote as a member of the school land commission, and as there are four other members constituting a working majority, who have the power to execute and whose duty it is to obey any statute or constitutional provision providing for the custody of the public funds involved herein, the writ should run against them, if it is determined that the contentions of the State Treasurer, are correct. The foregoing statement must not be construed to mean that, in the opinion of the court, the Governor is above the law, or that it is not his duty to obey any statute or constitutional provision prescribing his powers and duties. In the Huston case, *supra*, it was said:

"But in so holding it does not follow that the Governor of a state is above the law. He and his acts are as much subject to the law as the humblest citizen of the commonwealth. But a tribunal, other than the courts, must be resorted to for a correction of his official wrongs, if any, to wit, the Legislature."

It must never be forgotten that this is a government of laws, and not of men, and that the Governor, the judges, and the citizens of the state, and all who invoke the jurisdiction of its courts, must look to the law for their guidance; and, when there is doubt or ambiguity as to what the law is, that is a judicial question for the courts, which after it is determined, all must obey, notwithstanding what the disturbers of settled rules of government may say to the contrary. Therefore the construction of those statutes or constitutional provisions covering the matters herein is judicial in its nature, and for the courts to construe; and after they are construed, and the court decides where the funds belong, placing them there is purely a ministerial duty, for the performance of which, as a general rule, mandamus will lie.

On the second proposition, we cannot agree with the contentions of the relator. Section 1, art. 6, of the Constitution, after creating the office of State Treasurer, provides that he "shall perform such duties as may be designated in this Constitution or prescribed by law." There are no constitutional provisions which attempt to more specifically define the duties of the State Treasurer. The general duties of the State Treasurer are prescribed

State ex rel. Dunlop, State Treas., v. Cruce et al., Com'rs of Land Office.

by article 2, c. 108, Comp. Laws 1909, the first and last sections of which read as follows:

"Sec. 8632. Custody of money. He [the State Treasurer] shall have charge of and safely keep all public moneys which shall be paid into the state treasury, and pay out the same as directed by law, and perform all such other duties as now are, or may hereafter be required of him by law."

"Sec. 8641. Treasurer to pay loss. If in any instance the treasurer shall neglect to call to account any delinquents, whereby the public revenue may suffer loss, he shall be held and deemed accountable for the sums due by such delinquents to all intents and purposes, the same as if the funds had actually been paid into his office."

It is clear that the foregoing sections do not require all public funds to be paid into the state treasury. The purport of the first section is that the State Treasurer shall have charge of and safely keep all public moneys which shall be paid into the state treasury; but, unless we can find a statute which requires the funds involved herein to be paid into the state treasury, the State Treasurer cannot require it by mandamus. Recognizing this, the Attorney General, in his brief, on behalf of the relator, says:

"Sections 5861 and 5862 of the Revised and Annotated Statutes of Oklahoma 1903 (Wilson) were in force at the time of the passage and approval of the Enabling Act, and constituted a continuing rule and regulation by the territorial Legislature, under authority of Congress, as to the disposal of rentals in leasing sections 13 and 33. These were not repugnant to the state Constitution, nor locally inapplicable, and were consequently extended in force in the new state by section 2 of the Schedule, and now remain in force as the law of this state. They read as follows:

" 'That all moneys now in the hands of the Governor, the board for the leasing of school lands, or any member thereof, derived from the leasing of sections 13, reserved for educational purposes, and from sections 33, reserved for public building purposes, be immediately turned into the territorial treasury.

" 'All moneys hereafter reserved from said sources by the Governor, the board for the leasing of school lands, or any member thereof, shall be turned into the territorial treasury, so that the amount remaining in the hands of the Governor, the board for the leasing of school lands, or any member thereof shall at no time exceed five hundred dollars, from either of said sources; but nothing herein shall be so construed as to require such offi-

cial to make deposits with the territorial treasurer oftener than once a day.'

"At the first regular session of the state Legislature in 1907-08, a comprehensive scheme of legislation was enacted respecting the sale or rental of all public lands of the state, now appearing as chapter 94, Comp. Laws 1909, embracing articles from 1 to 6, both inclusive. Although almost every other conceivable feature is covered and provided for, no provision is made for the holding or disposition of the proceeds derived either from sales or rentals, except in the case of sales of indemnity lands (article 6), in which case it is provided that 'the money resulting from such sale shall be handled, disposed of, and used by the state in like manner as the other moneys belonging to said several funds under the laws of this state.' This argues, to our mind, more strongly than all else that the Legislature considered that it was unnecessary to specifically provide as to the temporary disposition of these funds; for the Constitution had already provided for them to go automatically into the state treasury, and it cannot be imagined that this important point would be overlooked by the Legislature in dealing with the final fruits from sales or leases."

Section 32, art. 6, of the Constitution, provides that the Board of Commissioners of the Land Office "shall have charge of the sale, rental, disposal, and managing of the school lands and other public lands of the state, and of the funds and proceeds derived therefrom, under rules and regulations prescribed by the Legislature."

The following are the pertinent rules and regulations prescribed by the Legislature, as far as they have been called to our attention, or as we have been able to find them: House Bill No. 8 was passed during the Legislature of 1907-08, and it is entitled:

"An act to confer on the Commissioners of the Land Office, consisting of the Governor, Secretary of State, State Auditor, Superintendent of Public Instruction, and the President of the Board of Agriculture, authority to manage, loan, invest and regulate the investment and deposit of the permanent school funds."

Section 1 thereof (section 7941, Comp. Laws 1909) provides that:

"The Commissioners of the Land Office   *   *   *   be and they are hereby authorized and empowered to manage, loan, invest and deposit, the permanent school fund donated to the state of Oklahoma by the Congress of the United States, or arising from the sale of public lands and from other sources."

And section 3 (section 7943, Comp. Laws 1909) provides that:

"*   *   *   Until such time as said funds may be safely and advantageously invested in the securities mentioned in the preceding section, said Commissioners of the Land Office shall be and they are hereby authorized and empowered to deposit said sums in such banks or trust companies as they may select.   *   *"

Section 6 of the same act (section 7946, Comp. Laws 1909) contains a repealing clause, repealing all laws in conflict with said act. In *Betts v. Commissioners of the Land Office*, 27 Okla. 64, 110 Pac. 766, this court reviewed at considerable length the various acts of Congress, provisions of the state Constitution, territorial and state legislative acts, pertaining to the public lands of the state and of the fund granted in lieu of school lands, and we do not deem it necessary to reiterate here anything that may have been decided in that case touching the powers and duties of the commissioners.

There is no question that the State Treasurer is the legal custodian of the various public funds and revenues of the state which are paid into the treasury; but the specific question herein involved is: Is the State Treasurer the legal custodian of the income from the permanent school funds, and can he compel the respondents to pay this fund into the state treasury immediately upon its coming into their hands? This question must be answered in the negative. It seems quite clear that, under the Constitution and acts of the Legislature passed since statehood, the Commissioners of the Land Office are the rightful custodians of the income, interest, and rentals from all lands and funds until the Legislature directs the distribution or payment of the same. If the Legislature directs such funds to be paid upon warrants drawn by the State Auditor upon the State Treasurer, it is incumbent upon the Commissioners to deposit sufficient funds with the State Treasurer to meet such appropriation, and this, we un-

derstand, always has been the practice. Consideration of these statutes and constitutional provisions repels the idea that these funds must be paid or deposited daily in the state treasury, so that at no time there shall be in the board's hands more than $500, as provided by the territorial statute relied on by the relator. That act relates only to sections 13 and 33; whereas section 5, art. 11, of the Constitution, provides that section 13 shall be reserved for the benefit of the University of Oklahoma and the University Preparatory School, the normal schools, the Agricultural and Mechanical College, and the Colored Agricultural and Normal University.

The sale of sections 33, as well as other lands, was provided for by article 2, c. 28, Sess. Laws 1909, which law was repealed by chapter 16, Sess. Laws 1910, wherein it was provided that all moneys received from the sale or rental of sections 33 shall constitute and be known as the "Public Building Fund," and this act was amended by chapter 89, Sess. Laws 1910. The obvious purport of all this legislation is that the funds derived from the sale or rental of sections 33 are to be set apart for the public building fund, and the funds derived from sections 13 are designed for the fund designated "Section 13 Fund, State Educational Institutions," and the income, interest, rental, and proceeds collected theretofore, or thereafter to be collected, of all said sections 13, or any indemnity lands granted in lieu thereof, are to be divided and distributed among the higher educational institutions. It follows that no part of the income, interest, or rental derived from either of sections 13 or 33 belongs to the common school fund of the state, and therefore cannot be apportioned to the common schools; and it further follows that the territorial legislative act, relating to these lands and funds, is clearly in conflict with the constitutional provisions and laws of the state, and that there is no constitutional mandate or legislative act which directs that the permanent school fund donated by Congress to the state, or arising from the sale of public lands or otherwise, shall be immediately placed in the hands of the State Treasurer. Whilst, on the other hand, the constitutional provision that the commissioners shall have the direction and control and management of

the public lands of the state under such regulations as may be prescribed by law, and every act of the Legislature passed since statehood, dealing with the income and proceeds derived from the sale of such lands, has either placed the absolute authority to control said funds in the hands of the Commissioners of the Land Office, or left it in their discretion as to the time when and the manner in which the same shall be paid out or covered into the state treasury to meet appropriations. The school land department has been conducted on that theory since statehood, properly, we think, and as there have been several sessions of the Legislature, and no disposition evinced to change the order of things, we conclude that it has received administrative and legislative sanction, which we are not disposed to disturb.

The peremptory writ is denied.

All the Justices concur.